IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUDHA KUMAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 04-1239 |
| | ) | |
| UPMC PHYSICIAN SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM ORDER

CONTI, District Judge

In this memorandum order, the court considers the motion for summary judgment filed by defendant UPMC Physician Services ("defendant" or "UPP") with respect to the claims of plaintiff Sudha Kumar ("plaintiff or "Kumar") for interference with her rights under the Family and Medical Leave Act of 1993, 28 U.S.C. § 2901 *et seq.* ("FMLA"), and retaliation under the FMLA, as well as her common law claims for intentional infliction of emotional distress and negligent infliction of emotional distress. After considering the motion, the joint statement of material facts, and the briefs submitted by the parties, the court will grant defendant's motion in its entirety.

### *Factual Background and Procedural History*

On January 19, 2000, plaintiff was hired for the position of Billing Specialist 1 by UPP.

Joint Statement of Material Facts ("J.S.") ¶ 1.  The responsibilities of a Billing Specialist 1, as

stated in the job description, included:

> Perform duties and job responsibilities in a fashion, which coincides with the service management philosophy of the UPP including the demonstration for the basics of service excellence towards patients, visitors, staff, peers, physicians and other departments within the medical center.
> - Follow-up with payors and subscribers as applicable on all unpaid claims in a timely fashion as defined to ensure timely reimbursement.
> - Validates successful transmission of claims to insurance carriers and intermediaries on assigned claims while performing claim follow-up.
> - Verify insurance benefits information with all available carriers via on-line electronic system or telephone with payors and/or subscribers as required.
> - Initiate and follow-up the appeal of claims based on the criteria met on a timely basis.
> - Review claim denials from the rejection report and perform claim follow-up based on policy.
> - Review demographic and insurance information on a routine basis and update the patient/guarantor as required to ensure accuracy of claims and statement filing .
> - Daily processing of all paper claims including review, attachments, stuffing in envelopes.
> - Perform other duties as assigned by your supervisor.

Id. ¶ 2.  Plaintiff's primary responsibility was to process and mail claims timely to certain

insurers, or "payors," in order to obtain payment for medical services rendered to patients by

UPMC physicians. Id. ¶ 3.  The form used to submit a particular claim to payors is printed by a

computer and includes, among other information, the date the medical services were provided

(the "date of service") and, on the bottom left corner of the form, the date on which the computer

prints out a particular claim (the "claim date") for processing by the billing specialists. Id. ¶ 4.

Plaintiff regularly gave all claim forms to her supervisor, Donald Marzullo ("Marzullo"),

who would then mail them to the payors. Id. ¶ 21.  When the claims were ready to be mailed to

the payors, plaintiff would remove any "post-it" stickers she may have placed on the claim forms

when she was working on them, and plaintiff would give the originals of the claim forms to

Marzullo for mailing. Id. ¶ 22.  No copies of the claim forms were made.  Id.

Plaintiff was responsible for processing claims for Gateway and Med+.  Id. ¶ 5.   Pursuant

to UPP's contract with payor Gateway, claims for services provided to patients were required to

be submitted to Gateway for payment within 180 days of the date of service. Id. ¶ 6.  UPP's

contract with payor Med+ required the claims for services provided to patients to be submitted

for payment within 90 days of the date of service. Id.  If the claims were not submitted to the

payors within the specified time, the contracts stipulated that the payors would deny the claims as

untimely, and UPP would consider the amount claimed as lost revenue. Id.

UPP's Family and Medical Leave of Absence Policy (the "policy"), which incorporated

the requirements of the FMLA, provided:

> Staff members shall be granted an FMLA [leave of absence] for up to 12 weeks for any
> qualifying event [such as serious health conditions of an employee or specified relatives]
> in any rolling 12-month period.  The 12-month period includes the 12 months preceding
> the first day of the FMLA [leave of absence] being requested by the staff member.

Id. ¶ 7.  Under the policy, whenever an employee made a request for FMLA leave of absence,

UPP looked back over the 52-week period immediately preceding the date of the requested

FMLA leave of absence in order to determine whether the employee exhausted her twelve weeks,

or 480 hours, of FMLA leave of absence entitlement. Id.

On September 17, 2002, plaintiff was involved in a non-work-related automobile

accident, and, according to plaintiff, sustained an injury to her back. Id. ¶ 8.  Plaintiff was granted

an FMLA leave of absence due to her back injury from September 23, 2002 through November

5, 2002.  Id. ¶ 9. This period of leave was continuous; that is, plaintiff performed no work during this period.  Id.  In addition to her initial FMLA leave of absence from September 23, 2002 through November 5, 2002, plaintiff was granted FMLA intermittent leave of absence due to her back injury during the periods November 11, 2002 through January 17, 2003, and January 30, 2003 through July 10, 2003.  Id. ¶ 10.  Plaintiff was also granted FMLA intermittent leave to care for her ill mother from June 24, 2003 through July 3, 2003. Id.  Plaintiff's total FMLA leave from September 23, 2002 through July 10, 2003 was for 507 hours. Id.

Despite plaintiff having exhausted her entitlement to 480 hours of FMLA leave pursuant to the "rolling" twelve-month period commencing September 23, 2002, as provided in UPP's policy, plaintiff was granted additional continuous leaves of absence under UPP's Personal Leave of Absence Policy ("PLOA") to care for her ill mother during the periods of July 11, 2003 through August 6, 2003, August 25, 2003 through August 28, 2003, and September 8, 2003 through September 19, 2003. Id. ¶ 11.  On September 23, 2003, plaintiff again became entitled to FMLA leave of absence under the rolling twelve-month period of UPP's policy.  Id. ¶ 22. Plaintiff was granted another continuous FMLA leave of absence to care for her ill mother from January 28, 2004 through February 24, 2004. Id.

According to plaintiff, UPP's Human Resources representative approved each of the FMLA leaves of absence described above.  Id. ¶ 27.  Plaintiff also stated that every time she returned from FMLA leave, she was reinstated to her regular job, and, prior to her employment termination, she was never given any problem or difficulties when she returned from any of her previous FMLA leaves of absence. Id.

4

Plaintiff's immediate supervisor was Marzullo, who reported to UPP's Billing Manager, Marsha Drakulic ("Drakulic"). Id. ¶ 13.  On January 20, 2004, Drakulic met with plaintiff to discuss plaintiff's backlog of unprocessed claims prior to the commencement of plaintiff's leave on January 28, 2004. Id. ¶ 14.  At the meeting, Drakulic asked plaintiff the oldest claim date of the backlog of her unprocessed claims.  Id.  Plaintiff told Drakulic that the earliest date on any of her unprocessed claims was December 4, 2003.  Id.  Drakulic asked plaintiff to try and finish the work on her desk prior to taking her leave.  Ex. A at 54 (Pl. dep.).[1]  Specifically, plaintiff testified:

> [Drakulic] never specified the dates, she just told me whatever it is on the desk, try to finish it, whatever you can.  This is the first time ever she came on my desk and told me and I try to finish it, whatever I can.

Id.

While plaintiff was on her FMLA leave of absence from January 28, 2004 to February 24, 2004, Marzullo took whatever claims were deposited on plaintiff's desk during her leave so that he could process the claims himself or assign the claims to be processed by another billing specialist in order to avoid plaintiff having to face a large backlog of claims when she returned from her FMLA leave of absence. Id. ¶ 15.

Marzullo testified that, on February 27, 2004, upon approaching plaintiff's cubicle to retrieve some mailing labels, he observed a manila file folder on plaintiff's desk containing 128

---

[1]Plaintiff did not submit an appendix or exhibits in response to defendant's motion.  The court, therefore, cites to defendant's exhibits.  In her response, plaintiff cites to exhibits by numbers, which correspond with defendant's reference to them by letters, e.g., Pl's Ex. 1 is Def's Ex. A, Pl's Ex. 2 is Def's Ex. B, etc.  Based upon the court's review of the record and both parties' submissions, the court concludes that the distinction appears to be an oversight as both parties are citing to the same record whether they refer to exhibits by number or letter.

original claims dating back to June 2003 and the vast majority dating back to early November 2003. Id. ¶ 16.  Plaintiff did not dispute that testimony prior to her termination, but in her deposition on March 18, 2005 – approximately one year after her termination – testified that the 128 claims were not on her desk when she left on intermittent leave on January 28, 2004.  Id.; Ex. A at 20-26.

On March 5, 2004, after plaintiff returned from her FMLA leave of absence, Drakulic and Marzullo met with plaintiff. J.S. ¶ 17.  At that meeting, Drakulic showed plaintiff the originals of the 128 claim forms which, Drakulic explained, Marzullo found on plaintiff's desk on February 27, 2004. Id. ¶¶ 17, 19.  The claims shown to plaintiff were claims to be submitted to Gateway and Med+.  Id. ¶ 18.  At the March 5, 2004, meeting, plaintiff acknowledged that she was responsible for processing claims for Gateway and Med+ and stated that she may have forgotten to mail them.  Ex. A at 18-26.  Approximately one year later, at her March 18, 2005 deposition, plaintiff, however, testified that, at the meeting, she assumed that the claims were her responsibility because they were claims to be referred to Gateway and Med+.  Id.  Upon looking at the dates of the claims and their lack of yellow post-it-notes, plaintiff testified at her deposition that the claims could not have been her responsibility.  J.S. ¶ 18.  Plaintiff testified that she did not think Marzullo or Drakulic would sabotage her by failing to mail her claims to payors.  Ex. A at 24.  Plaintiff, however, testified that it was possible for someone else to sabotage her by placing the claims on her desk.  Ex. A at 20, 25.

The loss of revenue to UPP from the 128 unprocessed claims was estimated to be worth $22,000.  J.S. ¶ 24.  Under UPP's Corrective Action and Discharge Policy, an employee's gross negligence, which may result in a loss of revenue, constitutes grounds for immediate discharge.

Id. ¶ 25.  Plaintiff received a copy of that policy.  Id.  Plaintiff was terminated by defendant on

March 8, 2004.  Id. ¶ 26.  Defendant asserts that plaintiff was discharged for "gross negligence."

Id.  Plaintiff argues that was one reason given for her termination, but that other reasons were

given such as "dishonesty; willful or intentional misconduct causing a loss of revenue; engaging

in conduct causing a loss of revenue; engaging in conduct with the potential for loss of revenue;

allegedly allowing 128 claims to go unprocessed, which were allegedly found by Mr. Marzullo

on February 27, 2004; and allegedly allowing 128 claims to go unprocessed plus an alleged 50 to

55 claims Ms. Drakulic discussed with plaintiff on or about January 20, 2004."  Id.

While not in the joint statement of material facts, the court notes that the evidence of

record included the May 25, 2005 deposition testimony of Kelly Leigh Sevick ("Sevick"),

defendant's assistant human resources director.  Sevick testified that defendant did not have a

definition of the term "gross negligence" in its policy. Ex. F at 51-52 (Sevick dep.).  Sevick also

stated that she knew of no employee other than plaintiff who had been terminated for causing a

loss of revenue.  Id. at 17, 52.  Finally, Sevick testified that, in the two years prior to plaintiff's

termination, no employee had been terminated for similar conduct and no employee had actually

engaged in similar conduct.  Id. at 17.  Sevick testified that plaintiff was terminated for "gross

negligence."  Id. at 51.  When asked why plaintiff was terminated, Sevick stated:

> Because those were claims that [plaintiff] had indicated that she had that were still needed
> to be processed and [Drakulic] had asked her to get those old ones completed prior to
> going on her leave of absence.  And she did not do that, nor did she notify anybody in
> management that these claims were outstanding and needed to be processed.

Id. at 53.

Monica Joyce ("Joyce"), defendant's director of human resources, also testified in her May 25, 2005 deposition that she did not recall defendant having a definition[2] for "gross negligence" in its policy. Ex. E at 31.  Joyce testified that "gross negligence" is caused by a "careless or willful act which may result in injury, damage, or loss of revenue." Ex. E at 31 (Joyce dep.).  Joyce stated that plaintiff was terminated for willful and intentional conduct.  Ex. E at 30.  The willful and intentional conduct related to 128 claims that were not communicated as outstanding by the plaintiff.  Ex. E at 26.  Joyce stated that she knew of no other employee terminated for causing a loss of revenue, except one found guilty of theft.  Ex. E at 36.

Marzullo testified in his May 25, 2005 deposition that plaintiff was terminated for gross negligence. Ex. C at 69 (Marzullo dep.).  Marzullo also testified: "So it was my impression that she was fired for not being honest with her manager when she was asked how far back her claims were." Id.

Plaintiff filed a complaint with this court on August 18, 2004, alleging claims for violations of the FMLA, as well as common law claims for negligent infliction of emotional distress and intentional infliction of emotional distress.  Defendant filed a motion for summary judgment on July 14, 2005 seeking judgment in its favor on all plaintiff's claims.

### *Standard of Review*

---

[2]Plaintiff argues that Joyce testified that there was such a definition.  A closer reading of the record, however, indicates that Joyce could not recall that a definition of the term existed in defendant's corrective action policy handbook:

|  |  |
|---|---|
| Question: | Is there a definition section within this policy that defines the terms listed? |
| Joyce Answer: | Not that I recall. |

Ex. E at 31.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 249.  The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing WRIGHT AND MILLER, FEDERAL PRACTICE § 2721); Pollack v. City of Newark, 147 F.Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957), cert.denied, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or *otherwise made admissible in evidence*") (emphasis added).

## *Discussion*

### I.        Plaintiff's Claim for Interference with FMLA rights

Defendant moves for summary judgment on plaintiff's claim for interference with FMLA rights on the grounds that defendant did not interfere with plaintiff's rights and that defendant granted her more than the maximum amount of leave required under the FMLA.  Plaintiff argues

9

that defendant violated her rights under the FMLA by not reducing her workload in the spring of 2003 and by instructing her to complete her workload prior to taking FMLA leave in January 2004.

The FMLA was enacted by Congress in 1993, in part to address problems arising from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(b)(1). The act was designed to provide a balance between "entitl[ing] employees to take reasonable leave for medical reasons" and "accommodat[ing] the legitimate interests of employers." 29 U.S.C. §§ 2601(b)(1-2); see Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005) (citing 29 U.S.C. § 2601(b)(1)) (holding that "the primary [purposes] of the FMLA are to 'balance the demands of the workplace with the needs of families'."). The FMLA grants eligible employees the right to take up to twelve work weeks of leave during a twelve-month period for any of the following reasons:

> (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
> (B) Because of the placement of a son or daughter with the employee for adoption or foster care.
> (C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.
> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1)(A-D). At the end of the leave period, the employee has the right to be restored to her former position or an equivalent position. 29 U.S.C. § 2614(a)(1).

An eligible employee[3] under 29 U.S.C. § 2612(a)(1)(C) or (D) may be entitled to take

FMLA leave intermittently

> on a reduced schedule when medically necessary.  The taking of leave
> intermittently or on a reduced leave schedule . . . shall not result in a reduction in
> the total amount of leave to which the employee is entitled . . . beyond the amount
> of leave actually taken.

29 U.S.C. § 2612(b).  The phrase "intermittent leave" is defined under the implementing

regulations as "leave taken in separate periods of time due to a single illness or injury, rather than

for one continuous period of time, and may include leave of periods from an hour or more to

several weeks." 29 C.F.R. § 825.800.

Under the FMLA, "it shall be unlawful for any employer to interfere with, restrain, or

deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29

U.S.C. § 2615(a)(1).  In order for plaintiff to assert a legitimate claim for an interference of

FMLA rights, "the employee only needs to show that [s]he was entitled to benefits under the

FMLA and that [s]he was denied them." Callison, 430 F.3d at 119.

"Courts have refused to recognize a valid claim for interference in the absence of any

injury." Alfiano v. Merck & Co.,175 F.Supp.2d 792, 794 (E.D.Pa. 2001)(citing Voorhees v.

Time Warner Cable Nat'l Div., 1999 U.S. Dist. LEXIS 13227 (E.D.Pa. 1999); Fry v. First

Fidelity Bancorp., 1996 U.S. Dist. LEXIS 875 (E.D.Pa. 1996)).  The scope of what constitutes

interference is described in the applicable regulations as follows: "Interfering with the exercise of

---

[3]The act defines an "eligible employee" as one who has been employed for at least twelve months by the employer and for at least 1,250 hours during the previous twelve-month period. 29 U.S.C. § 2611(A).  Both parties agree that Kumar is an eligible employee under the FMLA. See J.S. ¶ 2.

11

an employee's rights would include, for example, not only refusing to authorize FMLA leave, *but discouraging an employee from using such leave.*"  29 C.F.R. § 825.220(b) (emphasis added). Neither the statute nor the implementing regulations define what it means to be "discouraged" from exercising rights under the FMLA, and the United States Court of Appeals for the Third Circuit has not yet addressed this issue.  Several district courts, however, have considered the issue.

In Sabbrese v. Lowe's Home Centers, Inc., 320 F.Supp.2d 311 (W.D.Pa. 2004), this court found that genuine issues of material fact existed with respect to whether the disciplining of the plaintiff, a diabetic, for leaving work in violation of the employer's policies in circumstances where he needed to leave in order to control his diabetic condition discouraged his rights under the FMLA.  The facts of this case differ from Sabbrese in that the plaintiff in Sabbrese was disciplined for taking intermittent FMLA leave because he violated the employer's policies.  In this case, there is no evidence of record that Kumar was disciplined for taking FMLA leave.

In Burch v. WDAS AM/FM, No. CIV A.00-4852, 2002 WL 1471703 (E.D. Pa. June 28, 2002), the plaintiff brought suit alleging racial discrimination and FMLA retaliation and interference. Id.  With respect to Burch's FMLA interference claim, he alleged that his supervisor discouraged him from using FMLA leave by not responding promptly to an email request for leave and for sending Burch an email while he was on leave stating that his monthly report was overdue.  The court held that Burch failed to state an FMLA interference claim.  The court noted that the email to Burch's supervisor did not call for a written response, and that Burch's supervisor verbally approved the leave.  His leave request was not denied.  Burch also was not reprimanded for taking FMLA leave.  The court determined that the actions of Burch's

supervisor in reminding him of overdue reports while he was on FMLA leave did not constitute discouragement because an employer "is not required to excuse performance by an employee on the days he is on the job." Id. at *9.

The facts of this case are similar to those in Burch. The undisputed record demonstrates that plaintiff's receipt and entitlement to FMLA benefits are not in dispute. The issue to be resolved is whether plaintiff was denied any right to which she was entitled under the FMLA or was discouraged from taking FMLA leave. Plaintiff was not denied the right to take the leave she requested under FMLA guidelines; quite to the contrary, in the twelve-month period from September 2002 through September 2003 she was granted 507 hours of leave while only being entitled to 480 hours. She was granted 27 hours of leave more than the FMLA required. Once the rolling twelve-month period was over, she again applied for leave pursuant to the FMLA and was granted the leave. Plaintiff was never told that she was not permitted to take FMLA leave because her workload was too demanding. It is not disputed that according to plaintiff, defendant's human resources representative approved each of the FMLA leaves of absence, and every time plaintiff returned from FMLA leave, she was reinstated to her regular job, and prior to her termination, was never given any difficulty when she returned from any of her previous FMLA leaves of absence.

Plaintiff cites no decision in support of her argument that a claim under the FMLA exists because common sense tells the employer that when an employee takes leave or a reduced work schedule and thus works fewer hours per week, the employee's workload should be adjusted. Even if there were authority to support that argument, plaintiff adduced no facts to support her allegation that she was overburdened with work. The facts adduced suggest that, in fact, work

13

was reassigned to keep her from having a backlog.  While plaintiff was on leave in January 2004, her supervisor, Marzullo, took claims assigned to her for processing and assigned them to himself or another billing specialist in order to avoid plaintiff having to face a backlog of claims when she returned from her FMLA leave of absence.

Although plaintiff did not adduce facts in the joint statement with respect to plaintiff being asked by her supervisor to finish the work on her desk prior to beginning her leave, she makes that allegation in her response.  In plaintiff's deposition, plaintiff, however, testified that her supervisor did not ask that she finish the work on her desk, but rather ordered that she *try* to finish the work.  As that matter was not in dispute, the court cannot find that plaintiff was asked to finish her work before she left for leave.  As previously discussed, the record reflects that work was reassigned during plaintiff's absence so that plaintiff would not face a backlog on her return. The court concludes that summary judgment should be granted in favor of defendant with respect to plaintiff's claim for interference with her FMLA rights because no reasonable jury could return a verdict in favor of plaintiff on this claim.

## II.      Plaintiff's Claim for Retaliation

Defendant also moves for summary judgment with respect to plaintiff's claim for retaliation under the FMLA.  Plaintiff's claim for FMLA retaliation is subject to the burden shifting analysis adopted by the United States Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792 (1973).  In McDonnell Douglas, the Supreme Court developed the burden-shifting framework for courts to utilize as a tool in analyzing retaliation claims.  The McDonnell Douglas framework requires a plaintiff alleging a violation of the FMLA to first establish a *prima facie* case of discrimination. The *prima facie* case, the elements of which depend upon the type of

claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 & n.6 (1981).  In so doing, the *prima facie* case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  Id. at 254.

If the plaintiff successfully demonstrates a *prima facie* case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision.  Simpson v. Kay Jewelers, 142 F.3d 639, 644 n.5 (3d Cir. 1998).  The burden on the defendant at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision."  Fuentes v. Perskie, 32 F.2d 759, 763 (3d Cir. 1994) (emphasis added). Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "the McDonnell Douglas framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [i]s discrimination *vel non*."  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  The plaintiff, thus, has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

A.    *Prima Facie Case*

To establish a *prima facie* case for retaliation under the FMLA, a plaintiff must show that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the

adverse decision was causally related to her leave. Conoshenti v. Public Service Electric & Gas Co., 364 F.3d 135, 146 (2004).  The first two elements of the three-part test are not in dispute: plaintiff took FMLA leave and her termination is an adverse employment decision.  The court must consider the element of causation as it relates to plaintiff's termination and her use of FMLA leave.

The United States Court of Appeals for the Third Circuit articulated two main factors that are relevant with respect to establishing a causal link to satisfy a *prima facie* case of retaliation: (1) timing or (2) evidence of ongoing antagonism.  Abramson v. Wm. Patterson College of N.J., 260 F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period."). As this court stated in Sabbrese:

> The United States Court of Appeals for the Third Circuit is somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case.  See Woodson v. Scott Paper Co., 109 F.3d 913, 920-921 (3d Cir. 1997) ("Temporal proximity is sufficient to establish the causal link."); Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989) (causal link established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim); but c.f. Quiroga v. Hasbro, Inc., 934 F.3d 497 (3d Cir. 1991) (following bench trial, court determined "as a matter of fact" the timing of the plaintiff's discharge alone did not raise an inference of retaliation); Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where 19 months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred.").  Timing, however, in conjunction with other types of suggestive evidence, is clearly sufficient to demonstrate the causal link.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000).  For example, timing combined with evidence of inconsistent reasons given by an employer for an employee's termination was held to satisfy the causation prong of the prima facie case.  Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986).  See also Abramson, 260 F.3d at 289 ("Here, as we found in our discussion of the

discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); see also EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir.1997), cert. denied, 522 U.S. 1147 (1998).

Sabbrese, 320 F.Supp.2d at 323.

In this case, plaintiff adduced evidence that she was terminated a mere twelve days after returning from leave.  In addition, the court notes that defendant began an investigation into plaintiff's conduct nine days after she returned from leave.  While plaintiff did not adduce evidence as to the second prong of the test for a causal link – ongoing antagonism – the timing of her termination in relation to her return from leave – twelve days – and the timing of the investigation into her conduct after her return from leave – nine days, is found in the circumstances of this case to be sufficient to satisfy plaintiff's burden to establish a *prima facie* case.  See Sabbrese, 320 F.Supp. at 322; Wilson v. Lemington Home for the Aged, 159 F.Supp.2d 186, 195 (W.D. Pa. 2001)(Ambrose, C.J.)(holding that the twelve-day temporal proximity between defendant's termination letter deeming plaintiff to have quit because she failed to provide a medical certification requested by defendant's FMLA policy–a reason that violated the FMLA–and the exercise of plaintiff's rights under the FMLA established a causal connection).

### B. Shifting Burden of Production

Under step two of the McDonnell Douglas framework, where the plaintiff establishes a *prima facie* case of discrimination, a presumption arises that the employer unlawfully discriminated against the employee, shifting the burden of production to the defendant to "articulate some legitimate nondiscriminatory reason for the employee's rejection."   McDonnell

Douglas, 411 U.S. at 802; see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). "[A]lthough the McDonnell Douglas presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Hicks, 509 U.S. at 507 (citing McDonnell Douglas, 450 U.S. at 253).

A defendant is not required to meet this burden by a preponderance of the evidence, but rather "the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 257 (1981).  If the burden of production is met by the defendant, the ultimate burden of persuasion shifts back to plaintiff to prove "that the alleged reasons proffered by the defendant were pretextual and that the defendant intentionally discriminated against the plaintiff." Jalil, 873 F.2d at 706 (citing Burdine, 450 U.S. at 252-53).

At the summary judgment stage, the shifting burden requires the plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more than likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  To survive summary judgment, the plaintiff must submit evidence that  allows the factfinder "reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a

pretext)." Id. (citations omitted).  The non-moving plaintiff is required to "demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that 'the employer did not act for [the asserted] non-discriminatory reasons.'" Id. (citations omitted).  The necessary evidence may consist of the evidence submitted by the plaintiff in the *prima facie* case, as well as additional evidence rejecting the employer's legitimate non-discriminatory reason as pretextual.  Id. at 764.

Defendant's stated legitimate non-discriminatory reason for plaintiff's termination is gross negligence relating to her failure to process 128 claims worth almost $22,000.  There is no dispute that the stated reason is sufficient to shift the burden of production to plaintiff.  To meet that burden, plaintiff argues that defendant's Human Resources employees either disagree or are inconsistent as to what that term "gross negligence" actually means.  Joyce testified that the only other employee, to her knowledge, that had been terminated for loss of revenue was an employee that had been found to have stolen from defendant.  Sevick testified that no employee had been discharged in the two-year period immediately prior to plaintiff's discharge for engaging in similar conduct. Sevick also stated, however, that no employee had engaged in similar conduct. Plaintiff asserts that the evidence of record demonstrates that there is a genuine issue of material fact with respect to whether defendant's asserted reason was pretextual.  The court, however, is not satisfied that plaintiff can meet her burden of persuasion as required under the McDonnell Douglas framework.

Plaintiff argues that defendant's employees were unable to identify what constitutes "gross negligence" for the purposes of plaintiff's termination.  The court, to the contrary, finds

that there are no actual inconsistencies in the record relating to defendant's stated reason for plaintiff's termination.  Whether labeled "dishonesty" or "loss of revenue" or "potential loss of revenue" or "gross negligence," defendant consistently maintained that the reason for plaintiff's termination was her failure to process 128 claims resulting in a loss of nearly $22,000.  Other than pointing to references to language such as gross negligence or dishonesty, plaintiff did not adduce any evidence that defendant's stated reason for her termination was pretextual.  The evidence of record shows that Joyce, Marzullo, and Sevick all used the words "gross negligence" or "work negligence" to describe the reason for plaintiff's termination.  Plaintiff admitted that she told her supervisors at the March 5, 2004, meeting that the 128 claims that were not processed appeared to be hers and that she may have forgotten to mail them.  Plaintiff does not claim that any of her supervisors or decision-makers sabotaged her and there is no evidence that any decision-maker knew her statements were false at the time they made.  She only alleged after her termination that there was a possibility that "someone" may have sabotaged her.  Thus, at the time of her termination, the record reflects that plaintiff's supervisors were told by her that she may have "forgotten to mail" the 128 claims.  It was only after her termination that plaintiff retracted that statement. At the time the statements were made by plaintiff they supported defendant's reason for her termination – plaintiff's failure to process the claims.

Plaintiff did not adduce evidence to implicate that defendant's reasons at the time of her termination were pretextual.  No reasonable factfinder could find any weaknesses, implausibilities, inconsistencies, or contradictions in defendant's reasons for plaintiff's termination.  The retaliation issue in this case, contrary to plaintiff's arguments, is not similar to the issues raised in <u>Sabbrese</u> and <u>Wilson</u>.  In <u>Sabbrese</u>, the plaintiff contended the intermittent

leave he took was unforeseeable–a need to leave because he was experiencing symptoms of hypoglycemia.  320 F.Supp.2d at 320.  The plaintiff in Sabbrese had to leave the defendant's store on his lunch break in violation of the defendant's policies in order to eat because he felt he might pass out.  Id.  The defendant disputed whether a lunch break could qualify as intermittent leave.  Id. That issue is not present in this case.

Unlike this case, in Wilson, there was contradictory evidence regarding the defendant's stated reasons for termination.  In Wilson, defendant asserted that plaintiff was deemed to have quit her job because, among other things, she removed personal items from her office.  Wilson, 159 F.Supp.2d at 196-97.  That reason, however, was implausible because the employer's director of human resources called the plaintiff *after* the removal of the items but *before* the termination letter was sent and requested the plaintiff to provide a medical certificate for her leave.  Id.  There was an inconsistency in the reasons, i.e. removal of items versus failure to provide a medical certificate, for plaintiff's termination.

Defendant's motion for summary judgment with respect to plaintiff's claim for retaliation under the FMLA will be granted.  Based upon the uncontradicted evidence of record, no reasonable jury could render a verdict for plaintiff on this claim.

### III.    Plaintiff's Claims for Emotional Distress

Defendant also moves for summary judgment with respect to plaintiff's common law claims for intentional infliction of emotional distress and negligent infliction of emotional distress.  Defendant argues that both claims are barred by the exclusivity provision of the Pennsylvania Workers' Compensation Act, 77 PA. CONS. STAT. ANN. § 481(a).  Defendant also argues that, even absent the exclusivity provision, plaintiff's claim for intentional infliction of

emotional distress must fail because she failed to adduce any evidence of outrageous conduct. Finally, defendant argues that it is entitled to summary judgment with respect to plaintiff's claim for negligent infliction of emotional distress because plaintiff's alleged injury involved only emotional, not physical, harm.

First, it should be noted that plaintiff did not respond to the portion of defendant's motion seeking summary judgment with respect to the claim for negligent infliction of emotional distress. By reason of plaintiff not contesting that portion of the motion, it is appropriate to grant summary judgment in favor of the defendant with respect to that claim.

Plaintiff's claims for emotional distress are state tort claims governed by the law of Pennsylvania. Cox v. Keystone Carbon Co., 861 F.2d 390, 394 (3d Cir. 1988). Section 481(a) of the Pennsylvania Workers' Compensation Act provides:

> (a) The liability of any employer under this act shall be exclusive and in place of any and all other liability to such employees, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death as defined in section 301(c)(1) and (2) or occupation disease as defined in section 108.

77 PA. CONS. STAT. ANN. § 481(a)

In Matczak v. Franklin Candy and Chocolate Co., the United States Court of Appeals for the Third Circuit held that "Pennsylvania's workers' compensation statute provides the *sole remedy* 'for injuries allegedly sustained during the course of employment'." 136 F.3d 933, 940 (3d Cir. 1997)(citing Dugan v. Bell Telephone of Pennsylvania, 876 F.Supp. 713, 723 (W.D. Pa. 1994))(emphasis added). In April 1993, the plaintiff in Matczak was hired as a maintenance supervisor. Id. at 935. In November 1993, the plaintiff suffered an epileptic seizure at work and

was hospitalized for seventeen days.  Id.  In April 1994, plaintiff was fired by the defendant.  Id.

Plaintiff brought a suit alleging violations under the Americans with Disabilities Act, 42 U.S.C. §

12101 et seq. and the Pennsylvania Human Relations Act, 42 Pa. Cons. Stat. § 951 et seq.  Id.

The plaintiff in Matczak also brought claims against the defendant for intentional and negligent

infliction of emotional distress resulting from his termination.  Id. at 940.  The plaintiff claimed

that, as a result of his termination, he cried at least once a week.  Id.

     The court of appeals affirmed the district court's grant of summary judgment in favor of

defendant with respect to the plaintiff's claims for intentional and negligent infliction of

emotional distress.  Id.  The court of appeals held that "[t]he exclusivity provision of [the

Pennsylvania Workers' Compensation Act] bars claims for 'intentional infliction of emotional

distress and/or negligent infliction of emotional distress [arising] out of [an] employment

relationship'."  Id. (quoting Dugan, 876 F.Supp. At 724).  The court of appeals also held that, for

purposes of the negligent infliction of emotional distress claim, the plaintiff's claims of crying

once a week did not satisfy the requirement of establishing that the plaintiff's emotional distress

was accompanied by a physical harm.  Id.  Finally, the court of appeals noted that defendant's

conduct could not be considered extreme or outrageous.  Id.

     Plaintiff's complaint alleges that defendant's actions with regard to firing her and failing

to reduce her workload caused her emotional distress.  Compl. ¶¶ 8-18. Defendant's alleged

failure to reduce plaintiff's workload and defendant's termination of plaintiff's employment are

facts that arise directly out of an employment relationship. The court finds that plaintiff's claims

for intentional infliction of emotional distress and negligent infliction of emotional distress arise

out of her employment relationship with defendant and, thus, are barred by the exclusivity

provision of the Pennsylvania Workers' Compensation Act.[4]

Even assuming plaintiff's claims were not barred by the statute, the evidence adduced

does not rise to the level required for a finding of intentional infliction of emotional distress. <u>See</u>

<u>Matczak</u>, 136 F.3d at 940. The tort of intentional infliction of emotional distress contains four

elements: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or

reckless; (3) the conduct must cause emotional distress; and (4) the distress must be severe.

<u>Chuy v. Phila Eagles Football Club</u>, 595 F.2d 1265, 1273 (3d Cir. 1979). "It is well settled in

Pennsylvania law that a cause of action for intentional infliction of emotional distress is made out

where the conduct in question is 'so outrageous in character and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

a civilized society'." <u>Rinehimer v. Luzerne County Cmty. Coll.</u>, 539 A.2d 1298, 1305 (Pa.

Super. 1988)(quoting <u>Jones v. Nissenbaum</u>, 368 A.2d 770, 773 (Pa. Super. 1976)).

"Pennsylvania courts have found a cause of action for intentional infliction of emotional distress

to exist only in limited circumstances, where the conduct has been clearly outrageous." 

<u>Rinehimer</u>, 539 A.2d at 1305.

Without evidence being set forth in the statement of material facts, plaintiff argues

defendant engaged in outrageous conduct by failing to reduce her workload, by ordering her to

---

[4]Plaintiff fails to address 77 PA. CONS. STAT. ANN. § 481(a) as being a bar to her claims for emotional distress. In fact, plaintiff makes no reference to her claim for negligent infliction of emotional distress in her submissions to the court. Plaintiff misstates the applicable law relating to intentional infliction of emotional distress claims by arguing: "Therefore it need only be shown that the alleged actions causing the injury were done by the employer and not by a third-party." Pl.'s Response, at 14.

complete her workload prior to taking leave on January 28, 2004, and by terminating her employment.  First, several courts have held that loss of employment is generally insufficient to rise to the level of outrageous conduct necessary to state a claim for intentional infliction of emotional distress.  See Rinehimer, 539 A.2d at 1305("[C]ourts clearly held that loss of employment was too common a happening in today's world to rise to the level of outrageousness necessary to support a cause of action for [intentional infliction of emotional distress].").

This court also finds that defendant's other alleged conduct, namely, ordering plaintiff to finish her workload prior to taking leave on January 28, 2004 (in fact the plaintiff was asked to try to finish her workload), and failing to reduce her workload (the evidence adduced shows that her workload was reassigned to reduce her backlog) does not rise to the level of outrageous conduct necessary to support a claim for intentional infliction of emotional distress.[5]  "The extremeness of behavior associated with this tort necessarily means that it rarely will be found." Brieck v. Harbison-Walker Refractories, 624 F.Supp. 363, 366 (W.D.Pa. 1985); Chuy, 595 F.2d 1273 (holding that a claim for intentional infliction of emotional distress was actionable when the football team's physician reported that a player suffered from a potentially fatal blood disease, despite knowing that his diagnosis was unsupported); Papieves v. Lawrence, 263 A.2d 118 (1970)(Pa. 1970)(holding that an intentional infliction of emotional distress claim did lie against an automobile driver who caused the death of a child and concealed the body for two months).

---

[5]In Cox v. Keystone Carbon Co., the court of appeals held: "[I]t must be recognized that it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress."  861 F.2d 390, 395 (3d Cir. 1988)(citing Rineheimer, 539 A.2d at 1305).

Summary judgment will be granted in favor of defendant with respect to plaintiff's claims for emotional distress because her claims are barred by the exclusivity provision of the Pennsylvania Workers' Compensation Act and even if they were not barred, plaintiff did not contest the motion seeking to dismiss her claim for negligent infliction of emotional distress and the evidence adduced did not meet the standards necessary for a finding of intentional infliction of emotional distress.

### *Conclusion*

After reviewing the undisputed material facts of record and the submissions of the parties, the court determines that defendant's motion for summary judgment shall be granted in all respects.

### *Order*

**AND NOW**, this 28th day of June 2006, upon consideration of the parties' arguments and supporting documents,

**IT IS ORDERED** that defendants' motion for summary judgment (Doc. No. 14) is **GRANTED**.

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of defendant, UPMC Physician Services, and against plaintiff, Sudha Kumar.

The clerk shall mark this case closed.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

_____

cc:    Counsel of record